ORIGINAL

FILED

2011 AUG 22 PM 3:31

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY



I Randolph S. Shiner, Esq. (SBN 141603)
11150 Santa Monica Boulevard
Suite 1470
Los Angeles, CA 90025
v.: 213-293-5140
f.: 877-395-2051
Email: shinerlaw@gmail.com

Attorney for Plaintiffs Mordechai Y. Orian and Global Horizons, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MORDECHAI Y. ORIAN, an individual, and GLOBAL HORIZONS, INC.<br><br>Plaintiffs,<br><br>v.<br><br>FEDÉRATION INTERNATIONAL DES DROITS DE L'HOMME, corporate form unknown, EURO-MEDITERRANEAN HUMAN RIGHTS NETWORK, corporate form unknown, SIDIKI KABA, an individual, ABDELAZIZ BENNANI, an individual, and KAV LAOVED, an Israeli Corporation, form unknown,<br><br>Defendants. | ) CASE NUMBER LACV11-6904MRP(FFMx)<br>BY FAX<br><br>) **COMPLAINT** |

NOW COME THE PLAINTIFFS, MORDECHAI ("MOTTY") Y. ORIAN ("ORIAN") AND GLOBAL HORIZONS, INC. ("GLOBAL") as and for their complaint against the defendant FEDÉRATION INTERNATIONAL DES DROITS DE L' HOMME ("FIDH"), EURO-MEDITERRANEAN HUMAN RIGHTS NETWORK ("EMHRN") and Kav LaOved ("KAV") allege and show to the Court as follows:

## I. PARTIES AND JURISDICTION

1. Plaintiff ORIAN is an adult resident of the State of California, with his principal place of residence located at 23458 Moon Shadows Drive, Malibu, California 92065 and at all times material hereto was the President and Chief Strategic Officer of Plaintiff GLOBAL. In September, 2010, ORIAN was named in a criminal indictment by a grand jury in Honolulu, Hawaii arising out of activities of GLOBAL that allegedly took place in 2003 – seven years prior to the indictment. ORIAN's criminal case is pending before the United States District Court for the District of Hawaii in Honolulu as case number CR. NO. 10-00576 SOM.

2. Plaintiff GLOBAL is a corporation organized under the laws of the State of California and at all times material hereto had its offices located at 2722 Westwood Boulevard, Los Angeles, California 90025. At all times material, GLOBAL was in the business of importing legal agricultural labor from foreign countries into the United States pursuant to the Federal H2-A visa program.

3. Defendant FIDH is an international human rights organization whose principal place of business is located at 17 Passage de la Main d'Or, 75011, Paris, France. At all times material hereto, FIDH was responsible for the publication of the article entitled "Migrant Workers in Israel: A Contemporary Form of Slavery."

4. Defendant SIDIKI KABA ("KABA") is, upon information and belief, a citizen of France who at all times material hereto was the President of FIDH and was one of two signatories on the hereinafter described defamatory material. He is sued herein in his individual capacity.

5. Defendant EMHRN is a network of more than 80 human rights organizations, institutions and individuals based in 30 countries in the Euro-Mediterranean region, established in 1997 in response to the Barcelona Declaration and the establishment of the Euro-Mediterranean Partnership. It is located at Strandegarde 56, DK-1401, Copenhagen, Denmark. EMHRN was also responsible for the publication of "Migrant Workers in Israel: A Contemporary Form of Slavery" in conjunction with Kav La'oved, which is an Israel-based human rights organization whose purpose is to protect the rights of immigrant laborers in Israel and which was the original author of the material contained in the hereinafter described defamatory material.
6. Defendant Abdelaziz Bennani ("BENNANI") is, upon information and belief a resident of Copenhagen, Denmark and at all times material was the President of Defendant EMHRN, and was the second of two authors of the hereinafter described defamatory material. He is sued herein individually.
7. This Court has personal jurisdiction over as Defendants have committed tortuous acts within and without the State of California and in this District having an injurious effect on the Plaintiffs in California.
8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum of seventy-five thousand dollars ($75.000.00). exclusive of interest and costs, and there is complete diversity of citizenship between Plaintiff and Defendants. This Court also has supplemental jurisdiction over the claims for relief that arises under California statutory and/or common law pursuant to 28 U.S.C. § 1376(a) because it forms part of the same controversy and derives from the same facts.

9. Venue is proper in this District pursuant 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to the claim arose in this District.

## II. FACTS GIVING RISE TO THE COMPLAINT

10. In 2005, FIDH and EMHRN (at the direction of KIBI and BENNANI) published defamatory material about Plaintiffs Orian and Global, obtained from Defendant KAV stating:

> On 29 February 1996, 19 Chinese workers employed by the Global Manpower Company were expelled from the country after working for only a few months. Each had paid $5000 in China for the privilege of working in Israel for a two-year period; $3000 of this went straight into the hands of Global Manpower director Matti Orian. By the end of February Mr. Orian owed each of the workers between 2-3 months wages. Instead of paying the workers, he sent ten armed guards to surprise the workers in their sleep, beat them and drive them to the airport, where they were forcibly deported. Back in China, these workers demanded the return of their $5000; on this occasion Chinese representatives flew to Israel to negotiate and the Chinese Embassy put the representatives in touch with Kav La'Oved, who arranged a meeting with the Labour Ministry. (Hereafter "the defamatory material".)

11. This defamatory material was almost 10 years old when it was published and was and is false. In late 2005, Orian commenced an action in the Tel Aviv-Yaffo Magistrate's Court against Kav La Oved for defamation.

12. The facts were that a) Global (Israel) only imported Chinese workers in 1992 b) Global was not even in business in Israel in 1996 c) there was never any governmental investigation of Global or Orian d) there were never any lawsuits against the company or Orian arising out of his business activities in Israel.

13. The matter was resolved by a settlement out of court which resulted in an agreement by KAV to remove all references to ORIAN and GLOBAL. Copies of the pertinent court documents, including translations, are attached hereto as "Exhibit A".

14. In February, 2006, Orian discovered via the Internet that FIDH and EMHRN had republished the defamatory material originally authored by KAV. Orian and Global's attorney had to write a letter to FIDH and EMHRN requesting compliance with the settlement reached in the Israeli Court concerning the defamatory material.

15. On March 8, 2006, FIDH wrote a letter to ORIAN and GLOBAL's attorney which stated as follows:

"Dear Sir,

Following your letter dated February 28, 2006, we wish to inform you that, on March 7th, 2006, the International Federation for Human Rights (FIDH) has removed from its online report entitled « Migrant workers in Israel- A Contemporary Form of Slavery» any data allowing the identification of Mr. Mordechai (« Motti ») Orian, and Global Manpower."

A true and correct copy of this letter is attached hereto as Exhibit "B".

16. On March 13, 2006, the Executive Director of EMHRN wrote a letter to ORIAN and GLOBAL's attorney indicating that he would write back to tell ORIAN and GLOBAL what it, EMHRN was going to do, after a consultation with its attorney. No response was ever made.

17. Subsequently, FIDH made certain changes to the publication of the defamatory material that could not be googled, and was published as follows:

> On 29 February 1996, 19 Chinese workers employed by the Gl**al Man**wer Company were expelled from the country after working for only a few months. Each had paid $5000 in China for the privilege of working in Israel for a two-year period; $3000 of this went straight into the hands of Gl**al Man**wer director

Motti O. By the end of February Mr. O. owed each of the workers between 2-3 months wages. Instead of paying the workers, he sent ten armed guards to surprise the workers in their sleep, beat them and drive them to the airport, where they were forcibly deported. Back in China, these workers demanded the return of their $5000; on this occasion Chinese representatives flew to Israel to negotiate and the Chinese Embassy put the representatives in touch with Kav La'Oved, who arranged a meeting with the Labour Ministry.

18. Based on the foregoing, Plaintiffs were under the impression that FIDH and EMHRN had taken steps so that "Motty Orian" and "Global Horizons" did not show up in Internet search results and the matter was dropped.

19. Thereafter, upon information and belief, in between September 3 and September 9, 2010, subsequent to ORIAN's arrest on the above-referenced charges, FIDH, EMHRN purposely and maliciously republished the defamatory material in its entirety, without redactions, and did so upon information and belief, at the behest of unnamed co-conspirators in the United States for the express, malicious purpose of harming ORIAN because the US Attorney used the defamatory material in its submissions to the District Court in Hawaii upon which the Court based its decision to keep ORIAN in pretrial detention, despite the falsity of the information and the agreement reached in the Israeli Court and pursuant to the terms of FIDH's letter of March 8, 2006. A true and correct copy of the libelous pages that were republished are attached hereto as Exhibit "C".

20. The false and defamatory material was, upon information and belief, intentionally and maliciously made available to the government by FIDH and EMHRN at the behest of unnamed co-conspirators whose names are presently unknown to Plaintiffs.

21. Because Defendants' defamation of Plaintiffs has been disseminated widely throughout the world, their remarks were intended to hold ORIAN up to ridicule in his business relationships as a businessman, his social relationships and in his activities which otherwise call for the highest standards of honesty and ethics.

22. Defendants' defamatory remarks and their intentional republication have caused the ORIAN considerable mental and emotional distress.

23. Defendants' defamatory remarks in combination with their actions to disseminate said remarks to the US government and thence to the media further disparage Plaintiffs reputation are maliciously and tortiously interfering with Plaintiffs business relationships.

24. By reason of the intentional and per se defamatory comments written by Defendant KAV and their republication by FIDH and EMHRN, ORIAN has been caused him to suffer, inter alia, the special damages referenced in Paragraph 20, supra, gross impairment of his good name, public embarrassment, humiliation, impairment to his professional reputation, public impairment of his abilities and integrity, anxiety, emotional upset and public ridicule as well as additional time in jail as the direct and proximate result of Defendants' actions.

**FIRST CAUSE OF ACTION**

**(Libel Per Se by ORIAN Against all Defendants)**

25. Plaintiffs restate each and every allegation set forth above in paragraphs 1-24, inclusive, as though fully set forth at this point.

26. Defendants' actions in republishing the personal, false and defamatory statements after they had previously agreed to redact and remove them from their publication constitute

libel per se inasmuch as the statements accuse Plaintiffs of crimes and hold him up to shame and ridicule in his business or profession.

27. Defendants failed to use reasonable care in determining whether the statements were true or not. Indeed, they knew, based on the previous lawsuit in Israel that they were false, but republished the statements anyway.

28. Defendants' malicious and willful defamatory published statements have damaged the Plaintiff and are actionable for damages under the law of the State of California.

29. Accordingly Defendants should be held liable for damages to the ORIAN for a sum of at least $100 million.

**SECOND CAUSE OF ACTION**

**(Declaratory Relief by ORIAN and GLOBAL Against All Defendants)**

30. Plaintiffs restate each and every allegation set forth above in paragraphs 1-29, inclusive, as though fully set forth at this point.

31. By reason of the foregoing, Defendants' willful and malicious defamatory statements about the Plaintiff constitute libel per se for which they are answerable for damages under California state law.

32. That this Court order Defendants to immediately and finally remove such statements from all web-sites and other publications under their control; and Defendants be enjoined from continuing to issue libelous and defamatory statements about the Plaintiff.

**THIRD CAUSE OF ACTION**

**(Tortious Interference with Business Relationships by ORIAN and GLOBAL Against ALL DEFENDANTS)**

33. Plaintiffs restate each and every allegation set forth above in paragraphs 1-32, inclusive, as though fully set forth at this point.

34. By reason of the foregoing, Defendants have tortiously interfered with Plaintiffs' business relations and have damaged Plaintiffs' business by at least $10 million.

35. Accordingly, Defendants should be held liable for special damages to Plaintiffs for a sum of at least $10 million.

A jury trial is hereby demanded.

Dated at Los Angeles, California this 16th day of August, 2011.

I Randolph S. Shiner
Attorney for Plaintiffs

EXHIBIT "A"



בבית משפט השלום
בתל- אביב יפו

ת.א. 18136/05
בפני כב׳ השופטת מארק חורנציק דליה

26.9

נוטריון בנימין אדר BENYAMIN ADAR NOTAIRE

מרדכי (סנטו) [illegible] 059296269
ע״י ב״כ עוה״ד שלומי [illegible]
מרחי קפלן [illegible], תל אביב 64734

התובע

- נגד -

עמותת ״יקו לעובד״ מס׳ 58-017554-5
ע״י ב״כ עוה״ד ד״ר יובל לבנת ואחי
מרחוב י״ל פרץ 17 תל אביב 66853

הנתבעת

בית משפט השלום
תל-אביב-יפו
22 ספט׳ 2005

## הודעה לבית המשפט

מתוך רצון ליישב את התביעה מחוץ לכותלי בית המשפט ומבלי להודות בטענות מי מהצדדים, מתכבדים ב״כ הצדדים להודיע לבית המשפט הנכבד כי הגיעו להסכמה למחיקת כתב התביעה ללא צו להוצאות בתנאים כדלקמן:

1. הנתבעת מתחייבת למחוק כל איזכור על התובע ו/או על חבי בלזבל מנפאואר באתר האינטרנט שלה ו/או בכל פירסום אחר, לרבות דפי מידע וכיו״ב, המופץ על ידה.

   המחיקה תתבצע תוך שני ימי עבודה מיום אישור הסכם זה ע״י בית המשפט.

2. הנתבעת מתחייבת לא להפיץ ולא להעביר כל מידע, בכל דרך שהיא, אודות התובע ועסקיו. התחייבות זאת תחול בנוגע לכל מידע המתייחס לכל זמן שהוא עד למועד אישור הסכם זה, בין אם מידע שהיה כלול בפרסום נשוא התביעה ובין אם מידע שלא היה כלול בפרסום נשוא התביעה.

4. א. בנוסף, הנתבעת מתחייבת לא להפיץ ולא להעביר כל מידע, בכל דרך שהיא, אודות התובע ועסקיו, אשר נוגע לאירועים ו/או מעשים שמועד התרחשותם לאחר מועד אישור הסכם זה, אלא רק לאחר שפנתה לתובע וביקשה את תגובתו, ולאחר שנתנה לתובע זמן סביר (לפחות 30 ימי עבודה) ליתן תגובתו על המידע.

   ב. לאחר קבלת תגובת התובע למידע חדש כנ״ל, תערוך הנתבעת בדיקה יסודית של המידע ורק לאחריה תחליט אם ברצונה לפרסם ו/או להעביר את המידע אודות התובע ו/או עסקיו.

   ג. במקרה בו הנתבעת החליטה לפרסם או להעביר מידע חדש כנ״ל אודות התובע, לאחר עריכת בדיקה כאמור לעיל, תעביר לתובע הודעה על כך בה תציין את תוכנו של המידע.

   ד. פרסום המידע ו/או העברתו לאחרים יעשה רק לאחר חלוף 30 ימי עבודה מיום מסירת ההודעה לתובע, כאמור בס״ק ג׳ לעיל.

3. היה והנתבעת לא תמלא אחר האמור לעיל, יהיה רשאי התובע לחדש את ההליכים נגד הנתבעת.

4. בית המשפט יתבקש להורות על מחיקת כתב התביעה ללא צו להוצאות.

5. כן גם, יתבקש בית המשפט הנכבד להורות על החזר אגרת בית המשפט לידי ב״כ התובע.

| | | |
|---|---|---|
| ד״ר יובל לבנת, עו״ד<br>ב״כ הנתבעת | פסק דין<br>אני מאשרת [illegible]<br>[illegible] | שלומי עמידס, עו״ד<br>ב״כ התובע |

דליה מארק, שופטת
בית משפט השלום ת״א-יפו(1)
22-9-05

Form No. 19/2010 אישור מס׳

**<u>אישור תרגום</u>**

אני הח״מ בנימין אדר עו״ד נוטריון מרח׳ קפלן 17, תל-אביב ישראל מצהיר כי אני שולט היטב בשפות עברית ואנגלית, וכי המסמך המצורף והמסומן באות א׳ הוא תרגום לאנגלית* מדויק, שהוכן על ידי של המסמך המקורי הערוך בשפה העברית** שהוצג בפני ושהעתק צילומי ממנו מצורף ומסומן באות ב׳.

ולראיה הנני מאשר את דיוק התרגום ונכונות העתק הנ״ל בחתימת ידי ובחותמי, היום 26 בספטמבר 2010.

שכרי בסך 1,110 ש״ח כולל מע״מ שולם.




חותם הנוטריון

חתימת הנוטריון

* ציין שפת התרגום
** ציין שפה/ות המקור
הערה: מחק את הטעון מחיקה

**<u>CERTIFICATION OF TRANSLATION</u>**

I, the undersigned Benyamin Adar Advocate and Notary at 17 Kaplan St.Tel Aviv Israel hereby declare that I am well acquainted with the Hebrew and the English languages and that the attached document marked 'A' is a correct English* translation prepared by me of the original document drawn up in the Hebrew** language, has been produced to me and of which a photocopy is attached and marked 'B'.

In witness whereof I certify the correctness of the said translation and the copy by my signature and seal today September 26, 2010.

Fees paid NIS 1,110 including VAT.

Notary's Seal

Notary's Signature

* State language of translation
** State language/s of original
Note: Delete whatever is inapplicable

A N

At The Magistrate Court
In Tel Aviv Yaffo

26.9

Civil Case No. 18136/05
Before the hon. judge Mark Horenchik

נוטריון בנימין אדר BENYAMIN ADAR NOTAIRE NOTARY

Magistrate Court
Tel- Aviv – Yaffo

22.09.2005
Received / Checked

Signature ______

**Mordechai (Motti) Orian I.D. 059296269**
Represented by Shlomi Amiram Adv.
of 17 Kaplan St. Tel Aviv 64734 The Plaintiff

- Versus –

**Amutat "Kav La'oved" No. 5-017554-58**
Represented by Dr. Yuval Livnat @ others Adv.
of 17 U.L. Peretz St. Tel Aviv 66853 The Defendant

Magistrate Court

Tel-Aviv - Yaffo

Notice Given to the Court

In order to settle the claim out-of-court and without admission in the alleged claims of both parties, the Parties' representatives are honored to inform the hon. Court that they have reached a consent agreement on writing off the Statement of Claim without decree for expenses, pursuant to the following conditions:

1. The Defendant undertakes to erase any mention referring to the Plaintiff and/or to Global Manpower Corporation from its internet website and/or from any other distributed publication, including information brochures etc.

   The erasing will be done within two business working days after this agreement is confirmed by the Court.

2. The Defendant undertakes neither to distribute nor to transfer any information by all means whatsoever, referring to the Plaintiff and his business. This obligation applies to any information relating to any time up to the date this agreement is confirmed, even if the information was included in the publication that is the subject of this Statement of Claim, or any information that was not included in the publication that is the subject of this Statement of Claim.



4. a. In addition the Defendant undertakes neither to distribute nor to transfer any information by all means whatsoever, referring to the Plaintiff and his business, which relates to events and/or to actions that may occur after the date this agreement is confirmed, only after addressing the Plaintiff for his response, and after giving the Plaintiff reasonable time (at least 30 business working days) to express his reaction about the information.

   b. After receiving the Plaintiff's response to the a.m new information, the Defendant will examine thoroughly the information, and only then will decide its wish to publicize and/or to transfer the information which refers to the

Fax'/Email/ Date
22/09/200

Plaintiff and his business.

d. The publication of the information and/or transferring it to others will be done only after 30 business working days have elapsed since the notification was delivered as stated in the paragraph c above.

3. Once the Defendant does not fulfill the above mentioned, the Plaintiff will be allowed to resume the procedure against the Defendant.

4. The Court is asked to order the writing off the Statement of Claim without decree for expenses.

5. In addition the hon. Court is asked to order that the Court's fees will be returned to the Plaintiff's representative

(-)
Dr. Yuval Livnat Adv.
The Defendant Representative

(-)
Shlomi Amiram Adv.
The Plaintiff Representative

**Judgment**

I confirm the settlement agreement reached by the parties and give effect to it as a judgment, without expenses decree, and order the accounts department to return the Court's fees.

(-)Dalia Mark, Judge
Magistrate Court of T.A- -Yaffo

22.9.05



EXHIBIT “B”



Fédération Internationale des Ligues des Droits de l'Homme

ORGANISATION INTERNATIONALE NON GOUVERNEMENTALE AYANT STATUT CONSULTATIF AUPRES DES NATIONS UNIES, DE L'UNESCO, ET DU CONSEIL DE L'EUROPE ET D'OBSERVATEUR AUPRES DE LA COMMISSION AFRICAINE DES DROITS DE L'HOMME ET DES PEUPLES

INTERNATIONAL FEDERATION FOR HUMAN RIGHTS

FEDERACION INTERNACIONAL DE LOS DERECHOS HUMANOS

الفدرالية الدولية لحقوق الانسان

To Mr. John Goalwin
Attorney at law
World Trade Center
350 South Figueroa Street, Ste.499
Los Angeles
California, 90071

Paris, March 8th, 2006

Dear Sir,

Following your letter dated February 28, 2006, we wish to inform you that , on March 7th, 2006, the International Federation for Human Rights (FIDH) has removed from its online report entitled « Migrant workers in Israel- A Contemporary Form of Slavery » any data allowing the identification of Mr. Mordechai (« Motti ») Orian, and Global Manpower.

Sincerely Yours,

Sidiki Kaba
President

EXHIBIT "C"

was interrogated on 14 October 2001 by police in an on-going inquiry into allegations of bribery by a friend who "imports" foreign workers; the inquiry was temporarily suspended during the elections, but should now resume.

In order to escape the legal, social and fiscal obligations, recruitment agencies set up fraudulent strategies which are now well known: after a few months of existence they literally disappear. The consequences of such a practice can easily be imagined: unpaid wages, lost and disappeared passports, and legal migrant workers suddenly becoming illegal residents.

***Indenture: the system of "tied contracts" creates a situation of total subordination***

A common factor between migrant workers, across the different sectors in which they work, is the worker's relationship with the employer. It is important to stress the fact that most migrant workers come to Israel through an agreement signed between a contact in Israel and an agency in their country of origin. Thus it is in the country of origin that the recruitment contract between an Israeli employer and a foreign employee is signed. A nurse from the Philippines explains:

*"I worked as a nurse in the Philippines and I contacted a private agency to go to work in Israel. Everyone said there was plenty of work there. Here in Israel, I look after an elderly person. In the contract I signed, it said I needed to stay 2 years in Israel and that I would be paid $700/ month. But in fact I only get $500 and I am not paid in dollars. Sometimes, I am paid very late. I need to send money to my family and I need to repay the money I paid for the trip, because I paid $4000 to come here".*

The contract signed by the worker in his/her country of origin defines a normal relationship between employee and employer. Yet once in Israel, migrant employees find themselves in a situation of extreme subordination to their employers, especially domestic workers and care-providers. They are expected to be available at all times and to be completely docile, despite the fact that the terms of the contract are not respected by the employer (terms such as time off, wages, rest times, working conditions, etc). Workers in construction and agriculture are sometimes subject to a curfew, and are not allowed to leave their work sites (see Chinese contract at annex G).

Kav La'Oved has documented many cases where employers make illegal deductions from wages, or even fail to pay wages at all – and then dismiss the worker and arrange for him/her to be deported. Such cases, where the State arrests workers at the behest of an employer, have been held to be illegal, and the State has been ordered to pay compensation (Avi Goren v. State, 7988/01, and the case of Ms Kissus, 14 June 2002). However, it should be noted that despite the above-mentioned legal victory, the use of deportation by employers to avoid payment of wages still occurs.

On 29 February 1996, 19 Chinese workers employed by the Global Manpower Company were expelled from the country after working for only a few months. Each had paid $5000 in China for the privilege of working in Israel for a two-year period; $3000 of this went straight into the hands of Global Manpower director Motti Orian. By the end of February Mr.Orian

owed each of the workers between 2-3 months wages. Instead of paying the workers, he sent ten armed guards to surprise the workers in their sleep, beat them and drive them to the airport, where they were forcibly deported. Back in China, these workers demanded the return of their $5000; on this occasion Chinese representatives flew to Israel to negotiate and the Chinese Embassy put the representatives in touch with Kav La'Oved, who arranged a meeting with the Labour Ministry.

Kav La'Oved has also documented cases where foreign workers were transferred to different employers, and did not know who their employers were. Many foreign workers become illegal without knowing it, if their employer dies, or they are the subject of an inter-company transfer:

The inter-company transfer of workers constitutes, in effect, the sale of a worker, which amounts to trafficking, in breach of the UN and ILO Conventions listed above. If the employer is an agency, it can easily transfer the employee from one employer to another. In a significant case brought by Ha-Moked (Hotline for Foreign Workers), the Attorney-General's office issued a legal opinion requiring the Labour Ministry to transfer information requested about employers to the workers or their lawyers – but the Enforcement Division of the Labour Ministry has been unco-operative in many such cases.

In the case of care workers for people who are sick, disabled or elderly, mainly Filipino workers, until recently, if the employer died before the end of the work contract, the employee was obliged to leave Israel, and could only make a new request to return when s/he had reached his or her home country. Only in rare cases, requiring the consent of the employer or of the Ministry, may migrant workers change either their field of work or their employer before the contract expires. Einat Albin, a lawyer at Tel Aviv University Law Clinic, noted that "*when an employer dies, or the contract is discharged for any reason, the migrant worker in practice becomes illegal.*"- although she explained that, between May 2001 and July 2002, new regulations were introduced, allowing a worker in such a position 30 days to find a new employer. However these regulations are only available in Hebrew, and officials can still ask the former employer (or his/her family) why the worker left. The employer still holds the labour permit, and cannot get a new worker if the employee "runs away".

The vulnerability of the migrant employee is rooted in the fact that, in all sectors and for all nationalities, the employer has in practice the power to revoke the work visa (by terminating the contract of employment) – and thus the legal status – of the employee. This prerogative normally belongs to the State, but in Israel the employer is illegally taking over this power, even in cases where an employee has the legal right to work and live in the country. Migrant workers enter the country with a visa which allows them to work only for one specific employer, for a period of two, three or exceptionally five years. Therefore many of the migrant workers start out as legal workers, but then lose their job or change employers, and become illegal.

As we have seen, new workers are also obliged to pay a 'commission' which is split between the recruiting company and the contractor holding the import permit[16]. This practice was

[16] Source: Kav La'Oved, Newsletter, July 2002.